NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted October 25, 2011[*]
Decided October 25, 2011

**Before**

FRANK H. EASTERBROOK, *Chief Judge*

WILLIAM J. BAUER, *Circuit Judge*

DIANE S. SYKES, *Circuit Judge*

No. 11-1556

| | |
|---|---|
| CHAD E. GOETSCH, <br>     *Plaintiff-Appellant*, | Appeal from the United States District <br> Court for the Western District of Wisconsin. |
| *v.* | No. 09-cv-228-bbc |
| LETITIA LEY, et al., <br>     *Defendants-Appellees*. | Barbara B. Crabb, <br> *Judge*. |

**O R D E R**

Chad Goetsch cut his arm with a razor two days after he was transferred to Columbia Correctional Institution in Wisconsin. In this suit under 42 U.S.C. § 1983, he claims that staff members at Columbia violated his rights under the Eighth Amendment by ignoring his need for mental-health treatment before and after he harmed himself and by confining him to segregation to punish him for violating prison rules during the cutting incident. The district court dismissed the punishment claim at screening, denied Goetsch's

---

[*] After examining the briefs and the record, we have concluded that oral argument is unnecessary. Thus, the appeal is submitted on the briefs and the record. *See* FED. R. APP. P. 34(a)(2)(C).

motions for counsel, and granted summary judgment for the defendants on the claim of deliberate indifference. Goetsch challenges each of these rulings. We affirm the judgment.

In his complaint Goetsch asserted that Dr. Letitia Ley, a prison psychologist, had provided constitutionally inadequate care before his alleged suicide attempt and that two of Ley's colleagues, psychologists Mike Vandenbrook and Scott Rubin-Asch, offered scant mental-health treatment in the months that followed. He also contended that his Eighth Amendment rights were violated when he was ordered, as punishment stemming from the cutting incident, to spend 120 days in segregation. In declining to allow the latter claim to proceed, *see* 28 U.S.C. § 1915A(a), (b)(1), the district court noted that Goetsch had not identified who punished him and ruled that, even if he could, the punishment was not serious enough to implicate the Eighth Amendment. Afterward the judge twice denied Goetsch's requests that counsel be recruited to assist him. The judge reasoned that the complexity of the lawsuit did not exceed Goetsch's ability to prosecute it.

Following discovery the three psychologists moved for summary judgment. The evidence before the district judge can be summarized as follows. When Goetsch arrived at Columbia on February 21, 2006, he reported to a guard that he was suffering from anxiety and severe depression and was hearing voices. Dr. Ley visited him that afternoon at his cell. Before the interview Ley had reviewed Goetsch's medical file and learned that he attempted suicide in 1988 and also reported suicidal thoughts in 2003 while incarcerated at another prison. But the file also revealed that mental-health staff at another facility had concluded in 2002 that Goetsch faked or exaggerated symptoms in a "cry for help" and that his accounts of hearing voices were untrue. According to Ley's affidavit, reports of hearing voices are often feigned; Goetsch never disputed this assertion with admissible evidence.

The parties disagree about much of what was said during Dr. Ley's meeting with Goetsch. For example, Goetsch contends that he told Ley he would kill himself if he was not placed in a single cell; Ley wrote in a report about the interview that Goetsch had denied suicidal ideation. It is undisputed, however, that Goetsch wanted to be "red-tagged"—a designation that would have ensured him a single cell—and that he asked Ley, "What do you have to do around here to get a red-tag, beat up your celly or something?" Goetsch also acknowledges telling Ley he would create a "serious disturbance" if he did not get a single cell. At the end of the interview, Ley concluded that Goetsch was not a suicide risk and did not recommend that he be placed on suicide observation. She maintained Goetsch's previous diagnosis of chronic depression and a nonspecific personality disorder. Ley alerted her supervisor so that Goetsch would get follow-up care and wrote a report to security staff detailing Goetsch's threat to cause a disturbance. Goetsch was placed in segregation as a result of that threat.

Two days later Goetsch used a prison-issued razor to make five cuts on his right inner forearm. He was taken to the emergency room, where the wounds were closed with staples. Goetsch returned to prison later that day and was evaluated by Dr. Vandenbrook, who placed him on suicide observation. Vandenbrook saw Goetsch twice in the next four days before concluding that he no longer posed a risk to himself. Goetsch was taken off suicide observation and returned to segregation. Over the next several weeks, Vandenbrook continued to check on Goetsch during his rounds but did not conduct individual therapy sessions. Vandenbrook recommended that Goetsch be moved to a wing of the prison reserved for inmates with mental illnesses, but administrators did not follow his recommendation. Goetsch asked Vandenbrook several times to refer him to the Wisconsin Resource Center, a treatment facility for mentally ill prisoners, but Vandenbrook declined.

When Goetsch was moved in April to a less-restrictive segregation unit, Dr. Rubin-Asch became his primary clinician. Over the next ten weeks, Rubin-Asch twice conducted individual therapy sessions with Goetsch away from his cell. Administrators would allow Rubin-Asch to meet privately with an inmate only one hour per week, so he did most of his counseling while standing in front of the prisoners' cells. Goetsch declined these public encounters out of concern that other prisoners would overhear details of his psychological problems. Goetsch was released from segregation in June and placed in the general prison population.

In granting summary judgment, the district court reasoned that Goetsch lacked evidence that the three psychologists had been deliberately indifferent to his mental-health needs. Regarding Dr. Ley, the court assumed that she knew Goetsch posed a substantial suicide risk but concluded that no jury reasonably could find that her response to that risk evinced deliberate indifference to his condition. Regarding both Drs. Vandenbrook and Rubin-Asch, the court concluded that Goetsch could not establish more than a disagreement with their course of treatment. And regarding Vandenbrook, the court declined to consider Goetsch's new allegation, raised for the first time at summary judgment, that the psychologist also had been deliberately indifferent to his psychological condition *before* he cut himself. The judge noted that Goetsch had not sought leave to amend his complaint to add the allegation and reasoned that he should not be allowed to do so at summary judgment because he knew or should have known earlier any facts relevant to the contention and had not produced any evidence to support his new theory.

On appeal Goetsch first argues that the district court erred in granting summary judgment because, he contends, a jury reasonably could find on the evidence presented that the defendants' treatment decisions rose to the level of deliberate indifference. He also contends that the court should have let him pursue his argument that Dr. Vandenbrook was deliberately indifferent to his mental-health needs before he cut himself.

But like the district judge, we conclude that Goetsch did not produce sufficient evidence to establish deliberate indifference. To have done so, Goetsch needed to show not only that he suffered from a serious mental illness (which the defendants do not dispute), but also that the psychologists acted with "a sufficiently culpable state of mind." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (quotation marks and citation omitted); *see Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). First, regarding Dr. Ley, Goetsch needed to show that she was aware of a substantial risk of suicide but intentionally ignored that risk. *Minix v. Canarecci*, 597 F.3d 824, 831 (7th Cir. 2010). The district court was willing to assume that Ley did perceive a strong possibility that Goetsch would try to kill himself, but, in fact, the undisputed evidence demonstrates that Ley thought Goetsch was *not* a suicide risk. She evaluated him, analyzed his behaviors in light of his reported history of faking or exaggerating symptoms, and concluded that he did not pose a threat to himself. Her contemporaneous report to security staff showed that she believed Goetsch posed a potential threat to others, not to himself. Even assuming that Goetsch told Ley that he planned to hurt himself, prison officials are not required to believe everything inmates tell them, *Knight v. Wiseman*, 590 F.3d 458, 466 (7th Cir. 2009); *Lindell v. Houser*, 442 F.3d 1033, 1035 (7th Cir. 2006), even when the topic is suicide, *see Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 753, 756 (5th Cir. 2001). Without evidence that Ley believed he was a suicide risk, Goetsch's claim against her fails.

As for Dr. Vandenbrook, Goetsch contends he should have offered individual therapy sessions and referred him to the Wisconsin Resource Center. But disagreement with a course of treatment does not give rise to an inference that prison medical staff acted with deliberate indifference to a prisoner's needs. *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010); *Ciarpaglini v. Saini*, 352 F.3d 328, 331 (7th Cir. 2003). Vandenbrook evaluated Goetsch three times in the five days after he returned from the emergency room and kept him on suicide observation until he believed Goetsch no longer posed a threat to himself. He maintained regular contact with Goetsch in the following weeks, albeit in conversations through the cell door rather than in sessions in an office setting. He did not refer Goetsch to a different facility but did try to have him placed in an area of Columbia that could better address his issues. This course of treatment may not have been optimal, but it did not evince deliberate indifference. *See Sanville v. McCaughtry*, 266 F.3d 724, 736 (7th Cir. 2001); *Garvin v. Armstrong*, 236 F.3d 896, 899 (7th Cir. 2001). In addition, the judge's decision not to allow Goetsch to expand his claim against Vandenbrook to the period before he cut himself was reasonable given the stage of the litigation, *see Johnson v. Cypress Hill*, 641 F.3d 867, 873 (7th Cir. 2011), the lack of good cause for Goetsch's delay, *see George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 790–91 (7th Cir. 2011), and the lack of evidence that Vandenbrook had any reason to suspect that Goetsch posed a risk to himself before the cutting incident, *see Townsend v. Fuchs*, 522 F.3d 765, 775 (7th Cir. 2008).

As for Dr. Rubin-Asch, he is mentioned only twice in Goetsch's opening brief, and no argument is presented about the evidence concerning him. In any event, that evidence could not establish deliberate indifference. Rubin-Asch saw Goetsch twice in his office for individual therapy and offered further counseling at Goetsch's cell. Again, the evidence points only to disagreement over treatment, not deliberate indifference.

Goetsch also contends that the district court erred in dismissing at screening his claim related to the segregation time he received for cutting his arm. That punishment, insists Goetsch, was "cruel and unusual." We disagree. The conditions of an inmate's confinement violate the Eighth Amendment only if they deprive him of "the minimal civilized measure of life's necessities," *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981); *see Gillis v. Litscher*, 468 F.3d 488, 491 (7th Cir. 2006), and Goetsch's four-month stay in segregation does not meet this standard, *see Harden-Bey v. Rutter*, 524 F.3d 789, 792, 795 (6th Cir. 2008) (more than 3 years in segregation); *In re Long Term Admin. Segregation of Inmates Designated as Five Percenters*, 174 F.3d 464, 472 (4th Cir. 1999) (more than 3 years); *Leslie v. Doyle*, 125 F.3d 1132, 1135 (7th Cir. 1997) (15 days).

Finally, Goetsch urges that the district judge abused her discretion in denying his motions for counsel. But even if Goetsch had shown that the district judge abused her discretion—and he has not—we would still affirm the judgment because he cannot show prejudice, that is, a reasonable likelihood that a lawyer's involvement would have altered the litigation's outcome. *See Pruitt v. Mote*, 503 F.3d 647, 659 (7th Cir. 2007) (en banc). No jury reasonably could find on this record that the level of care Goetsch received constituted deliberate indifference, and we are given no reason to conclude that a lawyer would have helped Goetsch survive summary judgment. *See Jackson v. Kotter*, 541 F.3d 688, 700–01 (7th Cir. 2008); *Snipes v. DeTella*, 95 F.3d 586, 592–93 (7th Cir. 1996).

**AFFIRMED**.